HINSDALE SMITH & another *vs.* THE AGAWAM CANAL COMPANY.

The owner of land lying upon both sides of a natural stream of water which is not navigable may lawfully erect thereon a dam across the stream to such a height that in ordinary stages of the water it will not throw water back upon the wheels of an ancient mill above, although, in consequence of the erection of the dam, the ice, when it breaks up in the spring, becomes packed together above the dam, and the water is thereby set back so as to flood the wheels to a greater height and for a longer time than it has done before at that season.

TORT for damages to the plaintiffs' mills, caused by water thrown back upon them from the defendants' dam.

At the trial in the superior court, the plaintiffs opened their case as follows: The plaintiffs own ancient mills on Powder Mill Brook, about forty rods above the place where it empties into the Westfield River, and with a fall of two feet from their wheel to the river in ordinary stages of water. The defendants own land on both sides of the river, about four miles below the mouth of the brook, on which are mills and an ancient dam. In 1855, the defendants erected a reservoir dam above their ancient dam, and four feet below the level of the water at the mouth of the brook, in ordinary stages. Before the erection of the defendants' ancient dam, the plaintiffs' wheel was somewhat affected by back water in freshets and rises of water, but only for a day or two at a time; and afterwards the amount of back water was increased and continued for a longer time. Since the erection of the reservoir dam, and in consequence thereof, the ice, when it breaks up in the spring, becomes packed together above the dam, and the water sets back, so that the plaintiffs' wheel has been flooded to a greater height and for a longer time than before, varying in duration from a short time to six weeks.

The river is exceedingly swift and violent, and sudden and irregular in the times and extent of its freshets and rises of water. No question is made as to the reasonableness of the defendants' dam, except as to its height; and, when the water is unaffected by ice and freshets, it does not in any manner affect the plaintiffs' mills.

Upon this statement, *Lord*, J. intimated to the plaintiffs that in his opinion they were not entitled to recover; and thereupon, by consent, a verdict was returned for the defendants, subject to the opinion of this court.

*W. G. Bates & H. Morris*, for the plaintiffs, cited *Wright v. Howard*, 1 Sim. & Stu. 190; *Acton v. Blundell*, 12 M. & W. 349; *Embrey v. Owen*, 4 Eng. Law & Eq. 466; *Cary v. Daniels*, 8 Met. 465; *Tyler v. Wilkinson*, 4 Mason, 397; *Newhall v. Ireson*, 8 Cush. 595; *Thompson v. Crocker*, 9 Pick. 59; *Gould v. Boston Duck Co.* 13 Gray, 442; *Sprague v. Worcester*, Ib. 193; *Pitts v. Lancaster Mills*, 13 Met. 156; *China v. Southwick*, 3 Fairf. 238; *Perry v. Worcester*, 6 Gray, 544; *Talbot v. Whipple*, 7 Gray, 122.

*N. A. Leonard*, for the defendants, cited, in addition to some of the cases cited by the plaintiffs, *Thurber v. Martin*, 2 Gray, 394; *Merritt v. Brinkerhoff*, 17 Johns. 320; *Platt v. Johnson*, 15 Johns. 213.

Merrick, J. It is the well known and settled doctrine of the common law, that all the riparian proprietors have naturally an equal right to the use of the water which flows in a stream adjacent to their lands, just as it was wont to run, and without any other alteration or diminution than that which is the direct, necessary or unavoidable consequence of its lawful use; and that in the exercise and enjoyment of this right they are restricted and confined to and within the limits and boundaries of their respective estates. It is the general rule that they cannot lawfully divert or diminish the quantity of water which would otherwise descend to the proprietors of lands below, or throw it back upon the lands of those above. 3 Kent Com. (6th ed.) 439. Angell on Watercourses, § 340. *Gould v. Boston Duck Co.* 13 Gray, 442. But, under our statutes, any person

may erect and maintain a water-mill, and a dam to raise water for working it, across any stream which is not navigable; and for this purpose may lawfully flood the lands of all persons over which the water will be caused to flow by keeping up and maintaining the dam.  This privilege, however, is given subject to prescribed conditions and restrictions; one of which, among many others, is, that no such dam shall be erected to the injury of any mill lawfully existing either above or below it on the same stream.   Gen. Sts. *c.* 149, §§ 1, 2, *& seq.*   Rev. Sts. *c.* 116 *St.* 1795, *c.* 74.

From these provisions it is an inevitable implication, that, although the right is given indiscriminately to all riparian proprietors, he who first erects and establishes his mill does, by his priority of occupation, acquire to that extent a title to the use of the water in the stream prior and superior to that of any other person, and a right to maintain his dam against all proprietors of lands both above and below his own.  *Cary* v. *Daniels*, 8 Met. 466.  *Gould* v. *Boston Duck Co. ubi supra.*  But the right which is thus acquired is not so absolute as to give him the control of the whole stream, or to deprive other proprietors of the reasonable enjoyment of the privileges to which they are naturally entitled.  They may still construct and maintain dams across the stream at any point either above or below his mill, for the purpose of raising a head of water to propel, operate and work mills of their own, erected on the adjoining land, provided that their arrangements are so made that they will not unreasonably withhold and detain the water above, nor throw it back from below, so as to affect, impede, delay or obstruct the movement and operation of the wheels and machinery of his previously existing mill.  *Thurber* v. *Martin*, 2 Gray, 394. And in all such cases the material question arises, as to the state of the water to which these general rules are applicable; to which there can be no other answer than that they refer to the stream when the water is flowing in it at its ordinary height; not when it is substantially exhausted by the severity of a drought, or swollen into a flood by long continued rains or the sudden melting of snow.   It may not always be easy to ascertain or

determine what that height is; but it is safe to affirm, and that would seem to be all which is necessary to the decision of the present case, that it cannot exceed the height to which the water has risen when the bed of the stream is full, and when any increase will cause an immediate overflow of its banks. If in that state and condition of the stream the dam below will not cause back water upon the wheels of the mill above, nor be the occasion of any impediment in its free action, or in the full operation of the machinery and works contained in it, the maintenance of the dam will be a reasonable exercise of the right incident to the land; and the consequences resulting from it cannot justly be complained of, nor afford any legal cause of action in favor of the owner of the mill above. For in such relation of the structures to each other, it is manifest that no injury can possibly come to him, except from the operation of natural causes over which no control can be exercised. In the case of *Monongahela Navigation Co.* v. *Coon*, 6 Barr, 383, it is said by Gibson, C. J., in stating the opinion of the court, that " it is certainly true that a riparian owner is entitled to swell the water in the channel of the stream, in its natural state, up to his neighbor's line; and that he is not answerable for damage done by high water, however it may have been increased by the obstruction below." And he afterwards adds the statement, as a general principle, " that it is better for all that the whole power of the stream should be turned to account, than that particular damage on extraordinary occasions should be prevented by sacrificing part of it." In the case of *China* v. *Southwick*, 3 Fairf. 238, which was an action to recover for damage caused to a bridge which the plaintiffs were bound to maintain, it was held that if the dam erected by the defendants did not raise the water so high as to flow upon or injure the bridge, but that afterwards, while it was kept up and maintained by them, the water was by great rains and a violent wind thrown upon the bridge and it was thereby destroyed, the defendants were not liable for the injury, even though, if the dam had not raised the water to a certain height, the wind and rain superadded might not have occasioned it. It would be carrying the

doctrine of liability, it was said by the court, to a most unreasonable length, to run up a succession of causes, and hold each responsible for what followed, especially where the connection is casual and unexpected. From these principles the conclusion must be deduced, that riparian proprietors may erect and maintain dams on their own lands across streams, to raise a head of water for the working of mills, without being liable for consequences which are casual, remote and uncertain. The same general doctrine undoubtedly results from the provisions of our statute. It is obviously one of its chief and leading purposes to regulate the enjoyment by the riparian proprietors of their respective rights in such manner that the whole power of the stream, and all the uses to which the entire volume of its running water can be applied in the accomplishment of any beneficial object, shall be distributed among, and availed of by, them. Under such provisions, the maintenance of a dam by any riparian proprietor, who would avail himself of the privilege to which he is entitled, to such height that, in the common and ordinary state of water in the stream, it would not injuriously affect any existing mill, or mill-site upon which a mill or mill-dam has been lawfully erected and used, would be only an exercise and enjoyment of his right, and therefore could not subject him to liability for damages arising from an extraordinary accumulation of water by the operation of natural causes. The changes which result from such causes are uncertain in extent and in the times of their occurrence ; and the losses of which they are the occasion must be borne by those upon whom they fall.

It has been argued, in behalf of the plaintiffs, that a peculiar and modified rule in respect to the liability for damages resulting from floods and freshets should be applied in the present case, on account of the character and peculiarities of the stream upon which the works of the parties have been erected. It is said that, descending from a mountain district, it is sudden in its rise, swift and violent in its course, and subject each year to freshets of varying and unequal magnitude and duration, but always in a greater or less degree injurious in their effects.

From this description it is apparent that this stream is more liable than many others to considerable variations in the volume of its running water. This only shows that the use of it is exposed to more difficulties, and that it is of less practical value, than if it flowed in a more even and regular current. But it affords no reason why the general rule of law, which determines and regulates the rights of all riparian proprietors, should not be applied in this, as it is in all other, cases. The state, condition and current of different streams necessarily vary from each other; but the legal principles in relation to the rights of all persons whose lands are bounded by them are common and applicable to them all.

In view of these principles, it is impossible to say that a jury, upon the facts stated in the report, would have been warranted in finding a verdict for the plaintiffs. The reservoir dam of the defendants, by creating an obstruction in the stream, necessarily changed, to a considerable extent, its flow and current, and probably raised the water above and beyond some portion of its banks, so that the adjacent lands were thereby to a greater or less extent overflowed; for a reservoir could hardly be created without producing this effect. And yet when this dam had been built and completed, the top of it was six feet lower than the bottom, or lowest part, of the plaintiffs' wheel; and therefore, when the stream was in its ordinary state and condition, there was between those two points a fall of the water in it to that extent. And from these facts it is a necessary consequence that, if the plaintiffs sustained any damage by the rise of water, it must have been owing to the occurrence of freshets and extraordinary floods. For the action and results of these causes, the defendants cannot be held liable. Their dam was so constructed that, without the intervention of forces, casual and extraordinary, over which they could exercise no control, it could not have been the occasion of any possible injury to the plaintiffs. We are therefore of opinion that this action cannot be maintained; and that, according to the agreement of the parties, judgment must be entered on the verdict.